**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Plaintiff,

and

VANESSA BURROUS,          CASE NO.: 4:17-cv-00428-WS-CAS

        Intervenor,

v.

WHATABURGER RESTAURANTS LLC,

        Defendant.

_____/

**WHATABURGER RESTAURANTS LLC'S RESPONSE IN OPPOSITION
TO EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S
MOTION TO RETAKE THREE DEPOSITIONS, EXTEND THE DEADLINE
TO RESPOND TO SUMMARY JUDGMENT, AND FOR SANCTIONS AND
SUPPORTING MEMORANDUM OF LAW**

        Whataburger Restaurants LLC ("Whataburger") hereby responds to the Equal

Employment Opportunity Commission's ("EEOC") Motion to Retake Three

Depositions, Extend the Deadline to Respond to Summary Judgment, and for

Sanctions (the "Motion") [Dkt. 114]:

**I.**     **Introduction**

        The EEOC mischaracterizes both the law and its factual allegations

throughout much of its Motion. Whataburger's "recently-produced documents" are

not "key, highly relevant, incriminating documents" as EEOC has suggested, and, in several instances, they do not say what the EEOC has characterized.[1]

Among other things, the EEOC falsely accuses Whataburger of "hiding" documents – based entirely on the EEOC's mischaracterization that work-product protection requires involvement or direction from legal counsel. It does not – a fact that this Court recognized in its Order on the EEOC's Motions to Compel. [Dkt. 110, p. 13].

As another example, the EEOC claims the "recently-produced documents" demonstrate that "Whataburger leadership not only instructed that hiring be based on the 'customer base', but that 'customer base' includes the racial makeup of the population within a one-to-five mile radius of the existing, prospective or 'projected offset' Whataburger location." However, there simply is no document – old or new – that demonstrates that "Whataburger leadership" "instructed that hiring be based on the 'customer base'" – let alone that hiring be done according to the "racial makeup" of the customer base.

Further, the EEOC's Motion is based on several "recently-produced documents" that are completely irrelevant because they were created after Burrous quit. *See* [Dkt. 114, Ex. 2, 3, 4, 5, 6, and 7]. Although the EEOC contends that

---

[1] These "recently-produced" documents were produced per this Court's Order on the EEOC's Motions to Compel, starting at WHATABURGER058174.

2

Whataburger has a "feigned lack of knowledge" and "who knew what and when" is important to its Motion and Whataburger's Motion for Summary Judgment, these documents are not relevant to whether Burrous was retaliated against before she quit or whether Burrous was constructively discharged (i.e., forced to quit). In fact, neither the EEOC nor Burrous allege that <u>any</u> retaliation occurred <u>after</u> Burrous resigned – Burrous never applied to work for Whataburger again, she did not use Whataburger as a reference, and she does not accuse Whataburger of interfering with her job applications.

Moreover, this Court has already recognized that Whataburger's *Faragher/Ellerth* defense only relates to conduct <u>before</u> Burrous quit. [Dkt. 110, p.11]. The same is true for Burrous's constructive discharge claim, which necessarily focuses on why Burrous quit in July 2015 rather than what allegedly happened in August after she quit. As such, the EEOC's arguments about Whataburger's knowledge <u>after</u> Burrous quit or Whataburger supposedly "digging dirt" on Burrous <u>after</u> she quit are irrelevant.

Regardless, the EEOC should not be permitted to re-take any depositions because the EEOC chose to move forward with taking depositions while discovery disputes were pending and despite the EEOC's claim that additional documents should be produced – without seeking further postponement of case deadlines and without reserving the right to re-open any depositions.

3

## II.     Procedural History

The EEOC erroneously claims it was "forced" to move forward with the depositions of Misa Levin ("Levin"), Eurvin Fuller ("Fuller"), and Kevin Patterson ("Patterson") given the "impending fact-discovery deadline". [Dkt. 114, p.5]. However, the EEOC canceled depositions on several occasions claiming it could not move forward without what the EEOC claimed was needed discovery, including the discovery at issue in the EEOC's Motions to Compel. The EEOC also moved to extend the case deadlines on three separate occasions, primarily on that same basis, and the Court granted the EEOC's extensions each time. Rather than seeking an additional extension, the EEOC chose to move forward with its depositions in April, May, and June of 2019 – without the documents at issue in the EEOC's Motions to Compel.

## III.    Discussion

"Courts generally disfavor repeat depositions." *U.S. v. Stinson*, 2016 WL 2784118, *3 (M.D. Fla. May 13, 2016); *Global ePoint, Inc. v. GTECH Corp.*, 2015 WL 113979, *1 (D.R.I. Jan. 8, 2015) ("courts tend to disfavor repeat depositions"); *EEOC v. Product Fabricators, Inc.*, 285 F.R.D. 418 (D. Minn. 2012) ("such additional deposition is disfavored"). The EEOC must establish "good cause" for reconvening any depositions. *Moreno v. SERCO Inc.*, 2016 WL 9753775, *2 (N.D. Ga. Oct. 7, 2016). As recognized in the Advisory Committee Notes to Rule 30(d),

4

"[t]he party seeking a court order to extend the examination…is expected to show good cause to justify such an order."

The EEOC attaches ten documents – two of which were previously produced in the case[2] – that it claims establish a number of "facts" that establish "good cause" to re-take depositions. However, the EEOC mischaracterizes these documents and their relevance to this case, and has failed to establish "good cause" here.

### A.    Whataburger did not "hide" documents regarding its post-resignation investigation

The EEOC argues that Exhibits 2, 3, 4, 5, 6, and 7 relating to Whataburger's investigation into Burrous's allegations <u>after</u> Burrous quit were "improperly withheld" from production and, had they been produced earlier, would have led to relevant testimony from the deponents. On the contrary, Whataburger simply made good faith objections to the EEOC's discovery requests and, of course, did not produce documents that were the subject of those objections, particularly for documents involving Whataburger's work-product. Objecting to discovery cannot be considered "hiding" documents. In fact, in its Order covering the EEOC's Motions to Compel, the Court sustained some of Whataburger's objections. [Dkt. 110].

---

[2]   Exhibits 1 and 8 were previously produced as WHATABURGER029866 and WHATABURGER023819, respectively. *See* Ex. "A".

Notably, the EEOC's "improper withholding" argument is entirely based on a mischaracterization of the work-product doctrine – specifically, that the work-product doctrine only applies to documents prepared by an attorney, copying an attorney, or at an attorney's direction. On the contrary, as this Court recognized in its Order on the EEOC's Motion to Compel, "the rules protect the conclusions, opinions and legal theories of **more than just a party's attorney**." [Dkt. 110, p. 13] (emphasis added). "[T]he work product doctrine protects documents prepared in anticipation of litigation even if they were prepared by Defendant's agents and employees and **not by counsel**." *Id.* at p. 14 (emphasis added).[3]

In fact, work-product documents do not even need to copy an attorney or be prepared at an attorney's direction. *Jeffers v. Russell County Bd. of Educ.*, 2007 WL 2903012 (M.D. Ala. Oct. 4, 2007) (documents prepared by non-attorneys reflecting harassment investigation were work-product protected, even though documents were **not prepared at the direction of an attorney**); *Breland v. Levada EF Five, LLC*, 2015 WL 12995098 (S.D. Ala. Apr. 30, 2015) ("the work product

---

[3] *See also In re Denture Cream Prod. Liab.*, 2012 WL 5057844 (S.D. Fla. Oct. 18, 2012) ("[T]he undersigned declines to adopt the Plaintiffs' wholesale approach to concluding that certain documents withheld by the Defendants are not privileged based solely upon the fact that the particular document did not reference an attorney, was authored by a non-attorney, and/or was disseminated by two non-attorneys…thus, the work product doctrine…**does not require that the withheld document be prepared by an attorney, or even reviewed by an attorney**") (emphasis added); *Adams v. City of Montgomery*, 282 F.R.D. 627 (M.D. Ala. 2012) ("[T]he fact that Lilley, a nonlawyer, conducted the interviews and drafted the report does not vitiate the application of the [work product] doctrine.").

doctrine…does not require that the withheld documents **be prepared by an attorney, or even reviewed by an attorney**") (emphasis added); *Hertzberg v. Veneman*, 273 F.Supp.2d 67, 76 (D.D.C. 2003) ("the work-product privilege covers materials prepared by or for any party or by or for its representative; **they need not be prepared by an attorney <u>or even for an attorney</u>**.") (emphasis added).[4] In fact, Federal Rule of Civil Procedure 26(b)(3)(A) recognizes that work-product protection applies to non-attorneys, and contains **<u>no</u>** requirement that the document be prepared by **or** for an attorney – "a party may not discover documents…that are prepared in anticipation of litigation…**by or for another party or its representative (<u>including</u> the other party's attorney, consultant,…or agent)**." (emphasis added). There simply is no requirement under Rule 26(b)(3) that the document be prepared by **or** for an attorney in order to qualify for work product protection.

---

[4] *See also In re LDK Solar Securities Litigation*, 2010 WL 114009, *1 (N.D. Cal. 2010) (finding Rule 26(b)(3) provides protection "**even if** a document prepared by a party's employee does not contain an attorney's mental impressions or conclusions [and] was **not prepared at an attorney's request or for an attorney's use**…if it was prepared 'because of' the litigation") (emphasis added); *Angel Learning, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, 2010 WL 1579666, *1 (S.D. Ind. 2010) ("counsel's lack of involvement in preparing the documents has **absolutely no bearing** on the work-product inquiry; **a party can create work-product just like its counsel can**, so long as the materials are prepared for litigation purposes") (emphasis added); *Goff v. Harrah's Operating Co., Inc.*, 240 F.R.D. 659, 660–61, 67 Fed. R. Serv. 3d 804 (D. Nev. 2007) ("it may be surprising to long-time practitioners that 'a lawyer need not be involved **at all** for the work product protection to take effect") (emphasis added); *Vardon Golf Co., Inc. v. BBMG Golf Ltd.*, 156 F.R.D. 641 (N.D. Ill. 1994) ("[T]he plain language of Rule 26(b)(3)…extends the work product privilege to agents of a party to the litigation. Employees of a party are agents of the party, and work product prepared by them are privileged, even if not prepared in response to an attorney").

The exhibits relied upon by the EEOC speak for themselves – they were clearly prepared in anticipation of litigation. Burrous's resignation letter with its references to "hostile work environment" and a near perfect recitation of the "constructive discharge" legal standard ("making the work environment intolerable for any reasonable person") strongly suggested that Burrous would assert legal claims against Whataburger. Such verbiage triggered Levin's first statement – Exhibit 2 – and the cited Exhibits 3, 4, 5, 6, and 7. Further, Exhibit 5 shows that Whataburger attempted to contact Burrous shortly after receiving her resignation letter and, when she finally responded, she refused to answer questions over the phone and requested that any Whataburger questions be put in writing – which prompted Robison's response: "[w]hich we all know, she has contacted a lawyer." [Dkt. 114, Ex. 5]; Ex. "B", Burrous Depo., pp. 175:13-176:4. Thus, the documents prepared during Whataburger's investigation into her resignation letter allegations were done in anticipation of litigation and, therefore, protected by the work product doctrine. *See Dewit v. UPS Ground Freight, Inc.*, 2017 WL 3000029 (N.D. Fla. May 30, 2017) (work product applies if "at least **one** of the principal purposes for generating the materials was to aid in **possible** future litigation," and finding that party can establish work product protection if the materials were generated in response to an issue that regularly results in litigation) (emphasis added).

Finally, in ordering production, the Court never held that the documents were not protected by the work-product doctrine; instead, the Court only found that such protection was inadvertently waived by permitting certain testimony of one witness – Arturo Chavarria – in April 2019. [Dkt. 110, pp. 19-20]. At no point did Whataburger "improperly conceal" or "hide" documents, and the EEOC's accusation is demonstrably false.

**B.    Whataburger is not relying on its post-resignation investigation for its summary judgment motion or defenses in this case**

The EEOC falsely claims that it is critical to re-take depositions because Whataburger is relying on Exhibits 2, 3, 4, 5, 6, and 7 and its post-resignation investigation for its pending Motion for Summary Judgment because Whataburger raises the *Faragher/Ellerth* defense and denies Burrous was constructively discharged. Again, that is simply not true. Despite the EEOC's repeated attempts to move the goalposts and attempt to force Whataburger to rely on its post-resignation investigation in support of its defenses, Whataburger has repeatedly stated that it is not relying on any investigation it conducted after Burrous quit. As the Court has recognized, Whataburger's *Faragher/Ellerth* defense is that it distributed anti-retaliation and anti-harassment policies to Burrous, but she failed to comply with the established policies as she never reported her alleged retaliation or harassment to either the Human Resources department or through the anonymous 1-800 hotline as Whataburger's policy provides. Ex. "B", Burrous Depo., pp. 74:2-5, 238:1-25.

9

Whataburger's post-resignation investigation is completely irrelevant for this defense.[5] In fact, the Court acknowledged in its Order on the EEOC's Motion to Compel: "[h]ere, the **Defendant is also not relying on its [post-resignation] investigation to support its defense**." [Dkt. 110, p. 11] (emphasis added). In fact, the Court recognized that, "[w]hatever facts were revealed in the investigation are **implicitly immaterial, at least as to Defendant's *Faragher* defense**…Accordingly, the investigation itself is not 'at issue.'" [Dkt. 110, p. 11] (emphasis added).

Notably, the EEOC's cases cited as to the *Faragher/Ellerth* defense do **<u>not</u> <u>require</u>** that a defendant rely on a post-resignation investigation, but instead simply

---

[5] *Payne v. Great Plains Coca-Cola Bottling Co.*, 348 F.Supp.3d 1194, 1202 (N.D. Ok. 2018) (summary judgment based on *Faragher/Ellerth* even though **no** investigation occurred, holding "**if the employee fails to give adequate notice to the employer of the alleged harassment, the employer cannot be deemed unreasonable for failing to take corrective action**…[n]o reasonable jury could find that defendant acted unreasonably in not taking corrective action where defendant did not have a duty to act") (emphasis added); *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 2009 WL 1543651, *13 (N.D. Ind. June 2, 2009) ("Kelley's [*Faragher/Ellerth*] defense **is not** that it acted reasonably upon learning of the Plaintiffs' complaints, **but rather** that the Plaintiffs did not take advantage of Kelley's policies in reporting harassment and discrimination…[i]n other words, because the Plaintiffs allegedly **did <u>not</u> report their complaints <u>during their employment</u>, there is no internal investigation of any complaint to rely upon**…") (emphasis added); *Anderson v. Wintco, Inc.*, 2008 WL 619303, *3 (W.D. Ok. Mar. 4, 2008) (summary judgment based on *Faragher/Ellerth* where plaintiff did not report harassment until **after** her termination, holding "because plaintiff failed to report the alleged sexual harassment by her supervisor, defendant was not given any opportunity to investigate her complaints"); *Myers v. Cent. Fla. Inv., Inc.*, 2005 WL 8159929, *2 (M.D. Fla. Sept. 29, 2005) (**post-termination** investigation **not** part of defendant's *Faragher/Ellerth* defense, finding "this was **not** a standard *Faragher* investigation where a complaint is made internally by an **existing employee** and an employer follows standard procedure in investigating that complaint for purposes of undertaking prompt and corrective action") (emphasis added).

permit the employer to do so to support this defense. Whataburger is not doing that here.

As to Burrous's constructive discharge claim, constructive discharge focuses on what happened to the plaintiff <u>before quitting</u> and on the plaintiff's state of mind <u>when the plaintiff quit</u>. In a similar scenario in *Wesolowski v. Napolitano*, 2 F.Supp.3d 1318 (S.D. Ga. 2014), the court found the plaintiff's allegation that the defendant failed to take action on plaintiff's complaint made at the time of the plaintiff's resignation was irrelevant to a constructive discharge claim:

> Plaintiff's similar claim based on failure to take action against Rods for sending an incomplete e-mail must fail…Under such a theory, Plaintiff's claim fails, because a 'constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.' Within the same conversation of notifying Melvin of Rod's e-mail, [Plaintiff] asked to be transferred. Therefore, management's failure to take further action does not constitute an adverse employment action.

*Id.* at 1349. Similar to the cases the EEOC cites as to the *Faragher/Ellerth* defense, the EEOC cites cases where <u>the employer argued</u> that its post-resignation conduct defeated a constructive discharge claim. However, Whataburger is not making that argument here, and none of the cited cases find that an employer's allegedly flawed post-resignation investigation <u>supports a finding</u> of constructive discharge. Rather, the standard for a constructive discharge claim is: "the **work** environment and conditions of **employment** were so unbearable that a reasonable person in that person's position would be compelled to resign." *Virgo v. Riviera Beach Assoc.,*

11

*Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994) (emphasis added). By definition, "[i]n determining whether conditions are 'intolerable', the conditions are measured **at the time of the employee's resignation**." *Sester v. Idaho Home Health Hospice, LLC*, 2014 WL 970041, \*7 (D. Idaho Mar. 12, 2014). Burrous's **<u>working</u>** conditions could not be intolerable **<u>after</u>** she quit and no longer worked for Whataburger. Instead, a plaintiff's failure to complain while still employed about her alleged "intolerable working conditions" moots any post-resignation investigation, because the employer must be given a reasonable opportunity to remedy the situation **while the employee is still employed**. *Jones v. USA Petroleum Corp.*, 20 F.Supp.2d 1379, 1384 (S.D. Ga. 1998) ("[b]y depriving [the employer] of a reasonable opportunity to remedy the situation, plaintiffs neutralized their constructive discharge claim"); *Williams v. Barnhill's Buffet, Inc.*, 290 Fed.Appx. 759, 762 (5th Cir. 2008) ("[a]n employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged"); *Scott v. Ameritex Yarn*, 72 F.Supp.2d 587, 595 (D.S.C. 1999) ("[plaintiff's] failure to seek redress from [defendant] prior to her resignation bars her claim for constructive discharge").[6]

Whataburger has repeatedly stated that it is <u>not</u> relying on any post-resignation investigation for its defenses, and its defenses are still valid.  Importantly, the EEOC

---

[6] Notably, even after she resigned, Burrous refused to participate in Whataburger's attempted investigation, as she refused to talk to Tom Robison over the phone when he attempted to call her. [Dkt. 114, Ex. 5]; *see also* Ex. "B", Burrous Depo., pp. 175:13-176:4.

seeking Kevin Patterson as a possible third deponent only relates to conduct and investigations <u>after</u> Burrous resigned, and, thus, are irrelevant to Burrous's claims and Whataburger's defenses, and particularly not relevant enough to take his second deposition. Therefore, Exhibits 2, 3, 4, 5, 6, and 7 do not support re-opening any depositions.

### C. Eurvin Fuller was not aware of Burrous's complained of discrimination before Burrous quit

In presenting Exhibit 6, the EEOC vaguely claims that Eurvin Fuller was aware that Burrous complained of discrimination and was involved in the investigation into her complaint. However, the EEOC's exhibits show Fuller did not become aware of alleged whistleblower activity until <u>after Burrous quit</u> – when Whataburger received her July 2015 resignation letter.

Further, the EEOC mischaracterizes Exhibit 6 in suggesting that Fuller "was involved" in Whataburger's investigation into the allegations Burrous made in her resignation letter and then suggests that Fuller's supposed "involvement" contradicts his previous deposition testimony. In reality, Exhibit 6 does not show that Fuller spoke with anyone from human resources or Whataburger's legal department or otherwise became "involved" in any investigation. Instead, Exhibit 6 shows that Fuller was simply copied on e-mails about the early stage of the investigation and spoke with Tom Robison about having someone contact Burrous about her resignation letter. Notably, Robison was the only individual who spoke to Burrous,

and she refused to speak to him and instead asked that Robison place his questions in writing. [Dkt. 114, Ex. 6]. Exhibit 6 does not show that Fuller had any other "involvement", and only sent one e-mail in this chain asking: "Where are we on this?"

As previously stated, Whataburger's conduct and knowledge <u>after</u> Burrous quit has no bearing on Whataburger's defenses. [Dkt. 110, p. 11]. Though the EEOC repeats the line "who knew what and when" as being important to its Motion, the documents themselves show "who knew what and when" – Fuller had no knowledge until <u>after</u> Burrous quit. Thus, there simply are no new documents that suggest that Fuller became aware of Burrous's allegations <u>before</u> she quit or that justify re-taking his deposition on that basis.

### D. Whataburger did not "retaliate" against Burrous by attempting to find "prior mistakes"

The EEOC claims the e-mail chain in Exhibit 7 establishes that Whataburger "retaliated" against Burrous by attempting to "dig dirt" on her and find "prior mistakes." First, the subject e-mail chain was written by a human resources representative that was obtaining the background and historical context on Burrous – for instance, determining whether the employee has a history of dishonesty within the company. Ex. "C", Robison Depo., pp. 159:15-160:16. The e-mail was not "digging up dirt" on Burrous. In fact, Burrous was never formally disciplined, suspended, demoted, written up, or even given a negative performance evaluation at

14

any time during her employment with Whataburger, and she continued to serve in her role as the restaurant's hiring manager even after she alleges she complained. Ex. "B", Burrous Depo., pp. 153:8-154:2, 157:19-159:20, 173:17-175:8.

Second, the e-mail chain occurred **after** Burrous resigned. An employer cannot "retaliate" against an employee by "digging up dirt" after she quit and who was no longer employed, particularly where the EEOC recognizes that there was <u>no</u> such disciplinary history.[7] In an egregious case where the employer actually attempted to write-up the plaintiff after the plaintiff claimed to be constructively discharged, the court found defendant's direction to "write up the Plaintiff for anything they could find" **after** plaintiff's resignation did not constitute an adverse action because there was no disciplinary action carried out against the plaintiff. *Guity v. Uniondale Union Free Sch. Dist.*, 2014 WL 1330636, *16-18 (E.D.N.Y. Mar. 31, 2014). In fact, neither the EEOC nor Burrous even allege <u>any</u> retaliation occurred <u>after</u> Burrous resigned,[8] and the <u>only</u> claimed retaliation was by Johanna Risk <u>during</u> Burrous's employment. Ex. "B", Burrous Depo., pp. 188:16-189:7, 190:18-191:1; [Dkt. 99, ¶25].[9]

---

[7] Even if such "dirt" was found, Whataburger could not fire or otherwise discipline an employee who already quit.

[8] Notably, Burrous never applied to work for Whataburger again, she did not use Whataburger as a reference, and she does not accuse Whataburger of interfering with her job applications.

[9] Even if the attempt to find "prior mistakes" occurred during Burrous's employment, it still would not evidence "retaliation", as Burrous never suffered any disciplinary action and Burrous was obviously not privy to those e-mails. *See, e.g., Howard v. Walgreen Co.*, 605 F.3d 1239, 1245

E.    **Whataburger leadership did not instruct that hiring be based on the "customer base" regardless of the racial makeup of the population within a one-to-five mile radius of the existing, prospective or "projected offset" Whataburger restaurant**

The EEOC erroneously claims that the recently-produced documents demonstrate that "Whataburger leadership not only instructed that hiring be based on the 'customer base', but that 'customer base' includes the racial makeup of the population within a one-to-five mile radius of the existing, prospective or 'projected offset' Whataburger location." However, there simply is no document – old or new – that demonstrates that "Whataburger leadership" "instructed that hiring be based on the 'customer base'" – let alone that hiring be done according to the "racial makeup" of the customer base. The EEOC does not point to any recently-produced documents that demonstrate that "Whataburger leadership" "instructed that hiring be based on the 'customer base,'" nor does any such documentation – old or new – exist.  Instead, the EEOC's argument is premised on Fuller's e-mail dated May 6, 2015, which was produced long ago – on **July 25, 2018** – as part of Whataburger's original ESI production.[10]   In fact, the EEOC has spent several hours examining

_____

(11th Cir. 2010) ("nothing suggests…[defendant] took any action – including termination, demotion, or even a reprimand – that could have seriously affected [plaintiff's] employment"); *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("courts have been unwilling to find adverse actions where the suspension is not actually served"). In fact, the EEOC recognizes that Burrous did not have any PCDs or other write-ups in her personnel file, as also expressed in Exhibit 7 to the EEOC's Motion. It cannot be "retaliation" to simply ask for PCDs that do not exist on Burrous after she already quit.

[10] Produced as WHATABURGER029866 and attached as Exhibit 1 to the Motion.

16

witnesses on this e-mail, including Fuller and Levin whom the EEOC seeks to re-depose. However, on its face, Fuller's e-mail gives no direction regarding hiring; instead, his e-mail demonstrates, and all testimony concerning Fuller's e-mail was, that he was referring to customer satisfaction scores – not who to hire, and certainly not which race to hire. Ex. "D", Garnett Depo., pp. 48:22-50:9; Ex. "E", Levin Depo., pp. 248:4-249:10.  In fact, race is not mentioned at all in Fuller's e-mail, and Fuller himself is African-American. Ex. "E", Levin Depo., pp. 248:4-249:10.

The EEOC attempts to connect that misleading allegation – that "recently-produced documents" demonstrate that Whataburger hired based on the "customer base" – with other misleading allegations arising out of two proprietary site selection documents.  In short, the site selection documents referenced by the EEOC show that a large amount of demographic data was collected and included in reports concerning where to locate two restaurants.[11] However, the documents themselves state what demographic data was highlighted and "pertinent" concerning the decision on where to locate a site. WHATABURGER062162 limited the "pertinent demographic data" to the following factors: "Estimated Population (2016)",

---

[11] Whataburger is not filing the documents because they have been marked "Confidential" as Whataburger's confidential and proprietary data and records, and Whataburger is not waiving confidentiality by summarizing these documents herein. Further, the two site selection documents referenced by the EEOC do not relate to any restaurant in Tallahassee or even Florida where the allegations in this case are confined, and none occurred within the timeframe of the allegations in this case (first half of 2015). One is dated April 24, 2014 for a potential new restaurant in Flowood Mississippi, and the other is dated September 8, 2016 for a potential store location in Wichita Falls, Texas.

"Projected Population (2021)", "Projected Population Growth % (Annualized)", "Estimated Median Age (2016)", "Estimated Median Household Income (2016)", and "Estimated Daytime Population". WHATABURGER06215 limited the "highlights" to the following "Positive and Negative Factors" within a certain mile radius of the location: "consumer expenditure on food away from home per household", "percent of retail employees", "percent manufacturing businesses", "percent of other service businesses", "the site is located in a Power Center" (type of shopping center, "percent of households with incomes" between a certain range, "homes valued at less than" a certain amount, "percent not in the labor force", "total married families with kids", and "percent of business and financial occupations." Race is not mentioned at all as part of the highlighted items, positive or negative factors, or "pertinent" items. Nevertheless, the EEOC then attempts to connect the dots from these property site selection documents to hiring, even though race is expressly not featured in the large volume of information the documents describe as "highlights", "positive and negative factors", or even "pertinent." Further, there is simply no evidence that such site selection materials were considered in hiring, and all witness testimony is to the contrary. *See, e.g.,* Ex. "D", Garnett Depo., pp. 36:22-25, 39:6-40:4; Ex. "E", Levin Depo., pp. 67:16-68:20.

Finally, the EEOC insinuates that Whataburger improperly withheld these documents. But, as with the investigation documents, Whataburger simply made

18

good faith objections to the EEOC's vague, overbroad, and unduly burdensome discovery requests concerning all "customer base analyses" Whataburger conducted on a national scale and, of course, did not produce documents that were the subject of those objections. In fact, the Court narrowed the scope of the EEOC's requests for Whataburger's "customer base analyses" from the EEOC's desired six-year period to a four-year period and instructed the parties to confer to further reduce the national scope of the requests. [Dkt. 110]. After narrowing the scope through conferral, Whataburger produced the additional documents.

### F. The recently-produced Levin PCD document does not establish that Levin was terminated

The EEOC claims that Levin's Performance Coaching Document ("PCD") at Exhibit 10 – dated **nearly two years after** Burrous quit – "directly contradict[s] Levin's prior testimony that she resigned from Whataburger."[12] However, there is no contradiction. The EEOC previously questioned, and Levin previously testified, about the one PCD she received – stating it regarded "some management issues that we had at the stores." Ex. "E", Levin Depo., pp. 30:19-31:15. Further, the PCD

---

[12] The EEOC also claims the PCD "demonstrat[es] an explanation as to why Whataburger failed to produce any 1:1 meeting notes concerning Levin and upper management, including the 'RDO' [Eurvin Fuller]". However, Whataburger objected to the EEOC's request for all 1:1 documents, and the Court agreed – instead narrowing the scope of the production to only "one on one meetings **between** Risk, Levin, and Burrous, in any combination. **The request is deemed to not include meetings between those parties and other team members.**" [Dkt. 110, p.37] (emphasis added). Thus, the EEOC incredibly accuses Whataburger of "failing to produce" documents that this Court found to be overbroad and should not be produced.

attached as Exhibit 10 does not state Levin was fired from Whataburger; it explicitly states it is a "written discussion" and asks her to provide an "action plan" to improve. Moreover, Robison testified Levin resigned and was given a severance package, and Levin simply testified she resigned without being asked if she received severance. Ex. "C", Robison Depo., pp. 87:16-88:4; Ex. "E", Levin Depo., p. 16:2-12. There is simply no evidence, within the PCD or otherwise, that Levin was <u>fired</u> from Whataburger. Regardless, even if Levin was forced to resign or even terminated for the performance reasons addressed in the PCD, which as stated, was not the case, there is no conceivable relevance to Burrous's allegations. The PCD focuses on role modeling operational excellence, defining and implementing standards such as sanitation and food safety, and managing talent – nearly **two years** after Burrous quit. The PCD says nothing about Burrous, discrimination, harassment, or retaliation.

### G.     The EEOC chose to take the depositions without claimed relevant documents and cannot re-take depositions

The EEOC's entire premise for re-taking depositions is that it would be prejudiced if it could not confront individuals already deposed with allegedly relevant "recently-produced documents." However, even if the Court found that the "recently-produced documents" were somehow relevant, the EEOC should not be permitted to re-open depositions because the EEOC made the strategy choice to move forward with the depositions, despite the pending discovery disputes and the

fact that additional documents may be produced. It was not "forced" to move forward as the EEOC now alleges in its Motion.

Importantly, the EEOC canceled depositions on several occasions claiming it could not move forward without what the EEOC claimed was needed discovery, including the discovery at issue in the EEOC's Motions to Compel. Moreover, the EEOC also moved the Court for extension of the discovery and other case deadlines on three separate occasions, in large part, on that same basis. Notably, the Court granted the EEOC's extension requests each time. However, despite not having all documents it claimed were relevant and claiming additional documents should be produced in the future, the EEOC simply made the litigation decision to move forward with depositions. The EEOC could have sought a stay of the case deadlines pending the resolution of the discovery disputes, or another extension of discovery deadlines – but the EEOC chose not to.[13] In fact, the EEOC did not even request to

---

[13] Incredibly, the EEOC took the exact opposite stance it now takes in regards to a second deposition for Burrous. In scheduling Burrous's deposition, the parties were in a discovery dispute where additional documents were likely to be produced after the date scheduled for Burrous's deposition. Whataburger's counsel proposed that it was reserving the right to take Burrous's deposition a second time, if necessary, based on that potential later document production. But the EEOC responded that Burrous would only sit for **one** deposition, regardless of documents later produced. *See* Ex. "F", e-mail dated March 21, 2018, at pp. 1-2. In the e-mail, the EEOC cited *Moreno v. SERCO Inc.*, 2016 WL 9753775, *2 (N.D. Ga. Oct. 7, 2016), stating: "the law is clear that…Whataburger's voluntary decision to take these depositions now as opposed to after the resolution of pending discovery motions would not constitute the good cause necessary to warrant the taking of second depositions...Should Whataburger seek leave to take, or notice, second depositions of Mr. and/or Mrs. Burrous, EEOC will move for protective order and seek attorneys' fees and costs." *Id.* Notably, Whataburger did not seek to re-take Burrous's deposition, despite the discovery dispute pending at the time.

leave any deposition open at their conclusion or reserve the right to re-open any deposition.

In a similar scenario in *EEOC v. Product Fabricators, Inc.*, 285 F.R.D. 418 (D. Minn. 2012), the EEOC argued the opposite stance it now takes. In *Product Fabricators*, the defendants were involved in a discovery dispute with the EEOC, but chose to proceed with deposing the plaintiff. *Id.* at 419. Approximately one month after the plaintiff's deposition, the discovery dispute was still not resolved, and the defendants filed a motion to compel certain documents. *Id.* After the plaintiff's deposition and one month before the discovery deadline, the court ruled on the defendants' motion to compel and ordered production of certain documents. *Id.* at 420. The plaintiff then produced documents that showed for the first time that the plaintiff had a pre-existing injury – a key issue in the ADA disability case. *Id.* The defendants then sought to re-take the plaintiff's deposition, which the EEOC opposed. *Id.* Despite these later produced documents, the court denied leave to take the second deposition of the plaintiff. *Id.* at 423. The court held the defendants made the litigation decision to move forward with the plaintiff's deposition, despite knowing documents might later be produced due to the pending discovery dispute:

> Ultimately, Defendants made the **strategic decision** about what to ask [Plaintiff] during his deposition, and **about when to depose him**…Defendants argue that their 'inability to obtain complete records prior to the deposition was due to no fault of their own,' noting that they had served requests for production of [Plaintiff's] medical records approximately three (3) months before [Plaintiff] was deposed.

22

However, **Defendants also chose to go ahead with the deposition** of [Plaintiff] early in the discovery period, and **in spite of the ongoing dispute about the production of various documents**, including [Plaintiff's] medical records, **knowing full well that the eventual production of such documents might produce new information that Defendants might wish to ask [Plaintiff] about**. As previously noted, the discovery of 'helpful…new information…does not qualify as 'good cause' for modifying a scheduling order.'

*Id.* at 422-423. (emphasis added).

Similarly, in *Nellcor Puritan Bennett LLC v. CAS Med. Sys., Inc.*, 2013 WL 3242960 (E.D. Mich. June 26, 2013), the court found that documents later produced following a pending discovery dispute were not sufficient cause to re-open a deposition. Specifically, despite a pending discovery dispute, the plaintiff moved forward with the deposition of the defendant's vice president and, because the parties did not resolve the pending discovery dispute, the plaintiff filed a motion to compel two weeks after the deposition. *Id.* at *1. Additional documents were later produced after the parties resolved the motion to compel. *Id.* at *2. The plaintiff then noticed a second deposition of the defendant's vice president, and the defendant moved for a protective order, which the court granted. *Id.* at *2-3. The court found:

Nellcor decided to depose Mr. Herwig in the midst of a discovery dispute concerning consumer records and accuracy. **Instead of delaying the deposition, Nellcor took a risk by deposing Mr. Herwig before all the necessary information was available**. And at the conclusion of the deposition, Nellcor was aware of the possibility that more information could be discovered regarding Mr. Herwig and **elected not to leave the deposition open pending resolution of the discovery dispute**."

23

*Id.* at *2. (emphasis added). In fact, courts often prohibit re-opening depositions where the party seeking the depositions chose to move forward with the deposition despite a pending discovery dispute. *See, e.g., Global ePoint, Inc. v. GTECH Corp.*, 2015 WL 113979 (D.R.I. Jan. 8, 2015) (denying motion to compel second deposition, despite the fact that 7,500 documents were produced after the first deposition – "Global made that very decision, deposing Blazer prior to the production of all of the documents in this case. It must now live with that decision").[14]

## H.   Prior inconsistent statements are an insufficient reason to re-take depositions

Many of the exhibits presented in support of the Motion – such as Exhibits 2, 6, 9, 10, and the site selection "customer base" documents – appear to be presented merely because the EEOC alleges they "directly contradict prior testimony." *See, e.g.,* [Dkt. 114, p. 10 – explaining Exhibit 9].[15] Even assuming for the sake of

---

[14] *See also Moreno v. SERCO Inc.,* 2016 WL 9753775, *2 (N.D. Ga. Oct. 7, 2016) ("Given SERCO's voluntary decision to take Moreno's deposition and its inexplicable lack of diligence in resolving its discovery concerns beforehand, the Court concludes that it would not be appropriate to compel Moreno to appear for a second deposition"); *Bookhammer v. Sunbeam Products, Inc.,* 2012 WL 5188302 (N.D. Cal. Oct. 19, 2012) (denying motion to compel second deposition, despite later production of documents that allegedly established deponent committed perjury in first deposition – "That Defendant made a tactical decision that resulted in a litigation disadvantage does not warrant the reopening of Mary DiSilvestro's deposition").

[15] Notably, Exhibit 9 does not "directly contradict" prior testimony that Levin did not <u>directly</u> report to Fuller. Exhibit 9 is an application completed by Levin where she simply identifies Fuller as a job reference for her and vaguely characterizes him as "upper leadership." The document says nothing about Levin reporting directly to Fuller.

argument that the EEOC was correct that some "recently-produced documents" show inconsistencies in previously provided testimony, prior inconsistent statements are an insufficient reason to re-open depositions. "It is not unusual for parties to depose a witness and thereafter obtain evidence contradicting that testimony; such inconsistencies, however, do not justify reopening depositions, much less reopening discovery that has long since been closed." *In re Omnicom Grp., Inc. Sec. Litig.*, 2007 WL 2376170, *23 (S.D.N.Y. Aug. 10, 2007); *see also Wright v. Old Gringo, Inc.*, 2019 WL 4926883, *2 (S.D. Cal. Oct. 7, 2019) ("inconsistent statements…did not constitute good cause for reopening her deposition", noting "these are certainly areas and questions that counsel can investigate in cross-examination at trial"); *Barten v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 11512606, *2 (D. Ariz. July 8, 2014) ("Inconsistent or contradictory testimony is not enough by itself to justify reopening a deposition."); *Bookhammer v. Sunbeam Products, Inc.*, 2012 WL 5188302 (N.D. Cal. Oct. 19, 2012) (second deposition was not warranted despite later discovered documents demonstrating that the deponent committed perjury in previous deposition).

## I.     The "recently-produced documents" do not support a second deposition of the requested deponents

The EEOC specifically identifies three individuals whom it believes the "recently-produced" exhibits establish "good cause" to re-depose – Eurvin Fuller, Misa Levin, and (possibly) Kevin Patterson. But, as explained above, the exhibits

25

are not relevant to the claims and defenses in this action, and fail to establish the required "good cause" to re-depose any of the identified deponents.

Specifically, as the exhibits themselves establish, Fuller had no knowledge of Burrous's allegations until <u>after</u> she quit. Further, he had no involvement in the post-resignation investigation of her allegations other than being copied on e-mails with the human resources representative conducting the investigation and discussing that someone should call Burrous. Finally, the so-called "customer base" site selection documents are irrelevant, as they relate to two <u>non-Florida</u> restaurants outside of the relevant time period, they do not mention and are not in any way related to hiring, and race was expressly not considered to be one of the highlighted items, positive or negative factors, or "pertinent" items.

There is also not "good cause" to re-open Levin's deposition. Levin's statement in Exhibit 2 regarding reporting Burrous's allegations to her superiors was explored at length during Levin's deposition, and her testimony is <u>consistent</u> with the statement in Exhibit 2. Ex. "E", Levin Depo., pp. 131:19-134:16. Although Exhibit 2 may be slightly inconsistent with other parts of her testimony, as stated *infra* in Section H, mere inconsistency is not sufficient "good cause" to re-open her deposition. The e-mail chain in Exhibit 7 – which the EEOC characterizes as attempting to "dig dirt" on Burrous – is irrelevant to the claims in this case, as the e-mail occurred <u>after</u> Burrous quit, and neither the EEOC nor Burrous alleged <u>any</u>

post-resignation retaliation occurred. In fact, Whataburger did not retaliate against Burrous after she quit.

Finally, there is no "good cause" to re-depose Kevin Patterson, as his only alleged involvement relates to conduct and investigations <u>after</u> Burrous resigned, and, as previously discussed *infra* in Section B, the post-resignation investigation is irrelevant to Whataburger's defenses or the Motions for Summary Judgment.

### J.     Even if the Motion is granted, the EEOC is not entitled to the relief it seeks

#### *1.     The depositions should be limited*

If the EEOC is permitted to retake any depositions, the scope of the depositions should be limited to the "recently-produced documents." *See, e.g., Smith v. Miami-Dade County*, 2014 WL 407343 (S.D. Fla. Jan. 22, 2014) (specifically limiting scope of second deposition to later produced documents). For instance, in conferral, the EEOC's argument for re-taking depositions was primarily based upon a document that it apparently "missed" in its review of previously produced documents but "caught" for the first time after Whataburger's latest document production. However, it was not used as an exhibit to this Motion because Whataburger pointed out that it was previously produced in July 2018 and recently produced in duplicate. The Motion also relies heavily on the May 6, 2015 e-mail from Eurvin Fuller, [Dkt. 114, Ex. 1], which was also produced in 2018, and many of the witnesses were questioned on that specific e-mail for several hours. The EEOC

should be precluded from asking questions about or related to any such previously produced documents.

Further, if the EEOC's Motion is granted, it should not be a catalyst for the EEOC to re-ask questions that have been asked in the witnesses' first depositions. Instead, the depositions should be limited to the recently-produced documents themselves and exclude topics that were fully explored in previous depositions and that are not part of the recently-produced documents. For example, the broader topic of "whether Whataburger considers race in making its hiring decisions" – it did not – has already been exhaustively covered for several hours in the witnesses' first depositions, including countless questions about Exhibit 1 to EEOC's Motion and the phrase "do the teams reflect the customer base where we do business." That broader topic is not part of any of the recently-produced documents upon which the EEOC bases its Motion, including the site selection documents referenced *infra* in Section E.[16] Therefore, if the EEOC's Motion is granted, there should be no questioning on the exhausted topic of "whether Whataburger considers race in making its hiring decisions" because the recently-produced documents do not relate to that topic.  The same limitation should apply to the other topics that are not part

---

[16] There were only two recently-produced documents relating to the topic of "whether Whataburger considers customers' race as part of its analysis in deciding where to locate restaurants", and, as previously stated, those documents specifically state what information was considered to be highlighted, "positive", "negative", or "pertinent", and race was not in the listed highlighted, "positive", "negative" or "pertinent" information.

of the recently-produced documents – i.e., the EEOC should be precluded from covering any topics that are not part of the few recently-produced documents upon which its Motion is based and from re-asking questions asked in previous depositions. *See, e.g., Smith v. Miami-Dade County*, 2014 WL 407343 (S.D. Fla. Jan. 22, 2014) (specifically limiting scope of second deposition to later produced documents).

Finally, the EEOC requests three hours for each deposition.  Because the EEOC only relied on ten documents that were actually recently produced in support of its Motion and given the very limited scope of those documents, it certainly should not take three hours to cover the few recently produced documents cited by the EEOC. Therefore, if EEOC's Motion is granted, each deposition should be limited to one hour.

> 2. *The EEOC cannot compel the requested witnesses to testify in Miami*

The EEOC seeks to require witnesses to travel to Miami – where EEOC counsel's office is located – if depositions are permitted. However, neither Levin nor Fuller – two potential deponents specifically requested – are employed by Whataburger; Levin resides in Tallahassee, and Fuller lives in Atlanta. As such, these non-party witnesses cannot be compelled to travel to Miami for depositions. *See, e.g., Gray v. Derderian*, 2007 WL 9797500, \*4 (D.R.I. Nov. 14, 2007) ("Depositions of out-of-state witnesses shall be taken, in the case of an individual,

in the district of his or her residence"); *O'Connor v. Trans Union Corp.*, 1998 WL 372667, *2 (E.D. Pa. May 11, 1998) (plaintiff could not compel a non-party witness – who resided in Chicago, Illinois – to be deposed in Pennsylvania).

**K.     The EEOC's request for sanctions is baseless**

Even if the EEOC is permitted to re-take depositions, the EEOC is not entitled to its fees and costs. The EEOC's entire premise for sanctions is its frivolous argument – based on its mischaracterization of the work-product doctrine – that Whataburger "hid" a few investigation-related documents created after Burrous quit. The EEOC falsely claims the investigation documents produced could not be work-product because "the investigation was handled by Whataburger's managers and human resources, not counsel." In doing so, the EEOC once again erroneously argues that work-product protection can <u>only</u> apply to documents prepared by counsel, despite the Court's rejection of that argument in its Order on the EEOC's Motions to Compel. *See, e.g., Heartland Express, Inc. of Iowa v. Torres*, 90 So. 3d 365 (Fla. 1st DCA 2012) (finding work-product protection extends to "information gathered in an investigation conducted in anticipation of litigation by corporate non-attorney employees"); *Linthicum v. Mendakota Ins. Co.*, 2015 WL 4567106 (S.D. Ga. July 28, 2015) ("the fact and opinion impressions and observation of both attorneys **and non-attorney personnel** can be work product") (emphasis added).

The EEOC's persistence in making this discredited argument and request for sanctions based on it should be rejected.

Regardless, sanctions are inappropriate where, as here, a party simply withheld from production documents it believed – in good faith – to be privileged. *Smith v. City of Chicago*, 2019 WL 4825232, *7 (N.D. Ill. Oct. 1, 2019) ("Plaintiffs' withholding of certain documents and initial refusal to participate in a second deposition was substantially justified and that an award of expenses would be unjust. Plaintiffs made good-faith arguments in their opposition to the City's motion"). Here, Whataburger certainly had a reasonable and good-faith basis to assert that its investigation documents prepared in anticipation of litigation were protected by the work-product doctrine. In fact, this Court did not find that the documents were not protected work product. The only reason they were ordered to be produced was the Court's finding that the work-product protection was inadvertently waived through one witness's deposition testimony in April 2019.

The EEOC cites no relevant legal authority in support of sanctions here. Therefore, there simply is no basis to award any sanctions to the EEOC, including but not limited to "pay[ing] for all costs of the second depositions."

## IV.   <u>Conclusion</u>

For the foregoing reasons, Whataburger requests that the Court deny the

EEOC's Motion, and grant such further relief as the Court deems proper.

/s/ *S. Gordon Hill*
S. GORDON HILL
Florida Bar No. 0094374
ghill@hwhlaw.com
JEFFREY J. WILCOX
Florida Bar No. 0071163
jwilcox@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, Florida  33601-2231
Telephone:  813-221-3900
Facsimile:   813-221-2900
*Attorneys for Whataburger Restaurants LLC*

## <u>CERTIFICATE OF LOCAL RULE 7.1(F) WORD COUNT</u>

I certify that the above Response totals 7,869 words and does not exceed the 8,000 word limit set by Local Rule 7.1(F).

/s/ *S. Gordon Hill*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the above and foregoing pleading has been served upon Plaintiffs, through their counsel, through this Court's CM/ECF system, this 21st day of February, 2020.

/s/ *S. Gordon Hill*